**United States District Court**
**Northern District of Indiana**
**Hammond Division**

| | | |
|---|---|---|
| Jimmy Robinson, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:07-CV-486 JVB |
| | ) | |
| Bayer HealthCare, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Plaintiff Jimmy Robinson, an African-American, was a longtime employee at Defendant

Bayer HealthCare's Mishawaka plant. On September 5, 2006, before starting his shift, he made a

comment to a female manager about her appearance. The manager thought that Plaintiff looked

drunk and smelled of alcohol and ordered him to undergo alcohol testing. After some protests,

Plaintiff agreed to be tested, but apparently could not produce a urine sample on the first attempt.

In this suit, he claims that the manager used this occasion as a pretext to fire him, whereas her

real reason was based on racial bigotry. At the conclusion of discovery, Defendant moved for

summary judgment. Having reviewed the parties' briefs, the Court finds no genuine issues of

material fact and grants Defendant's Motion.

**A. Summary Judgment Standard**

A motion for summary judgment must be granted "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party supports its motion for summary judgment with affidavits or other materials, it thereby shifts to the non-moving party the burden of showing that an issue of material fact exists. *Keri v. Bd. of Trust. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

Rule 56(e) specifies that once a properly supported motion for summary judgment is made, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *Keri*, 458 F.3d at 628. A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986).

**B. Facts**

As relevant to Plaintiff's claims, the facts, taken in the light most favorable to Plaintiff, are as follows:

**(1)** *Defendant's Policies Regarding Alcohol Testing*

Defendant Bayer HealthCare operates a medical plant in Mishawaka, Indiana. Plaintiff Jimmy Robinson, who is an African-American, worked as a production employee at the plant and had been with the company for twenty-two years. Production employees at the plant are represented by the United Steelworkers, Local Union No. 12273.

Defendant and the Union had a Collective Bargaining Agreement which covered the terms and conditions of employment for Union members. The Collective Bargaining Agreement contains express provisions regarding drug and alcohol testing:

3. Any employee being at work impaired by alcohol, drugs, or controlled substance is strictly prohibited.

        ***

5. Whenever an employee's observed behavior raises a reasonable suspicion about the employee's physical condition or fitness to perform his or her job, a breathalyzer test or urine and blood samples may be taken and screened by a laboratory for the presence of alcohol, drugs, and controlled substances. An employee found to be impaired or under the influence of alcohol, drugs, and controlled substances and who cooperates with blood, urine, or breathalyzer testing, will be given a one-time opportunity to enroll in the current Bayer Healthcare employee assistance program. If the employee enrolls in such program and follows the guidelines set by Bayer Healthcare and the established provider, he/she will retain employment with the Company. This will not apply to employees who have been terminated as a result of a serious violation of Company rules for other reasons. An employee who is reasonably suspected of violating this policy and refuses to submit to a search or inspection, refuses to give a blood, urine, or breathalyzer sample, or is found to be in possession of alcohol,

3

drugs, or controlled substances will be subject to discharge.

(Englebrecht dep. 180:10–23; Englebrecht dep. Ex. 1.)

Employees suspected of being under the influence of alcohol at work must submit to

urine and breathalyzer tests. In 2006, the Mishawaka plant was equipped for urine tests but not

for breathalyzer tests. Defendant sent employees suspected of being under the influence of

alcohol at work to an outside facility for breathalyzer screening. Someone at the plant would call

a cab to transport the employee to the outside testing facility. This process was followed multiple

times during 2002–2006.

**(2)** *Plaintiff's Termination*

On September 5, 2006, Plaintiff, who suffers from gout, took 50 milligrams of Indocin

between 1:00 a.m. and 2:00 a.m., 25 milligrams at 6:30 a.m., and 25 milligrams at 11:00 a.m. to

treat his condition.[1] That day, Plaintiff slept until 1:50 p.m. His work shift started at 2:30 p.m.

Plaintiff ate a bratwurst sandwich and left for work. Before going inside the plant, he used mouth

wash to get rid of the bratwurst smell.

Inside the plant, Plaintiff was standing by his locker when he summoned Human

Resources Consultant Theresa Englebrecht to talk to him. Plaintiff asked Englebrecht how much

he could say before she fired him. He then told her that he had seen her over the previous

weekend and referred to the clothes she was wearing, specifically short pants and a top.

Englebrecht was not amused: she thought Plaintiff's comments were out of the ordinary for him

---

[1]Some of the common side effects associated with taking Indocin are headache, nausea, dyspepsia, drowsiness, dizziness, confusion, and slurred speech. (Pf.'s Ex. 4, Dr. Ahuja's Letter.)

as he had never spoken to her like that nor had he ever called her over to his locker. Englebrecht observed that Plaintiff's eyes were red and glazed over, and she believed she smelled alcohol. Englebrecht thought that Plaintiff should be sent for alcohol testing.

Englebrecht went back to her office and attempted to contact Plaintiff's supervisor. She also reviewed the drug and alcohol policy in the Collective Bargaining Agreement.

Meanwhile, Plaintiff reported for a shift meeting in his department. After the meeting, Plaintiff asked Supervisor Don Keeler for a "Y-day." A Y-day is given when an employee is sent home for the day because of lack of work, and the absence is not counted against the employee. He wanted the Y-day because he wanted to go home and did not want to be at work. Keeler declined Plaintiff's request.

Shortly after their conversation, Keeler told Plaintiff that someone had smelled alcohol on him and ordered him to submit to alcohol testing. The two then began walking to the Occupational Health Department. Along the way, Plaintiff attempted to punch out on the time clock. It took him several times before he succeeded. Plaintiff then walked out of the plant and got into his truck. He started the engine and sat there for a couple minutes when a coworker approached and told him that he needed to take an alcohol test.

Plaintiff returned to the plant and went to the Occupational Health Department. At the Department, he signed the consent forms but only after a long discussion with management. The consent form stated that Plaintiff would be tested by both urine sample and breathalyzer. Plaintiff understood that he was required to submit to both tests and that failure to comply could result in discipline, including termination.

Nurse Debbie Rimel gave him a cup to collect urine. Plaintiff went into the restroom but,

according to him, could not urinate. He stayed in the restroom "long enough to pee, a minute, minute and-a-half, " (Pf.'s Dep. at 91:10), but "[urine] would't come out, just wouldn't flow for [him]" (*id*. at 91:20–21). He claims that, when he came out without the sample, Englebrecht said, "There is no pee in the cup. You can't pee, you're discharged" (*id*. at 92:6–7). Defendant, on the other hand, maintains that Englebrecht told Plaintiff that, since he was unable to provide a urine sample, he could do it at the outside testing facility where he needed to take the breathalyzer test in any case.

Moments later, Plaintiff saw a cab outside and was told by Englebrecht and Union Steward Mike Warner that he needed to go to an outside testing facility. Plaintiff also heard Englebrecht tell Union Steward Warner that a taxi was going to take him to a hospital or Medpoint for testing. (Pl.'s Dep. 113:7–114:16; Warner Dep. 72:1–12.) However, believing that he had been fired, Plaintiff refused to go. Eventually, Plaintiff left the Occupational Health Department and was met by Mishawaka police. The police asked him to blow into a breathalyzer and the instrument registered an alcohol blood level of .24%. Supervisor Charlie Walker then took Plaintiff home.


**(3)** *Grievance Proceedings*

After Plaintiff's termination, the Union filed a grievance on his behalf. During the grievance, Englebrecht told Union Steward Warner that the "sticking point" in bringing Plaintiff back was his failure to admit that he had an alcohol problem and that he would not agree to get help. Warner advised Plaintiff to admit to Englebrecht that he had an alcohol problem and seek treatment. Likewise, Union Representative John Carlson told Plaintiff to comply with

Englebrecht's requests. Plaintiff, however, kept denying any alcohol problem.

Ultimately, Plaintiff's grievance went to arbitration and a hearing before Arbitrator Deborah Brodsky was held in March 2007. At the hearing, Plaintiff continued insisting that he was sober on September 5 and that he did not refuse the test but Arbitrator Brodsky denied his grievance:

> If the grievant had been more remorseful and candid in his testimony, the Arbitrator would have been amenable to some sort of Last Chance Agreement for Mr. Robinson. Instead, Mr. Robinson's testimony was extremely detrimental to his case. Rather than admitting he made a mistake, he came up with every excuse conceivable (and mentioned defenses never brought to light in earlier meetings).

(Englebrecht Aff. Ex. 4 at 3–4.)

Dissatisfied with the outcome, Plaintiff sued Defendant in this Court.

**(4)** *Plaintiff's Earlier Interactions with Englebrecht*

More than a year before being fired, on July 20, 2005, Plaintiff complained to plant security that another employee, Becky Holt, who is white, poured a soft drink inside his truck and threw a bottle at him, striking him on the shoulder. Immediately after this incident, Holt went to Englebrecht to confess what she did. Holt asked Englebrecht for permission to remove from his locker some love letters she wrote to Plaintiff. She said she had been having an affair with Plaintiff and wanted to put an end to it. Upon Holt's assurance that letters were hers, Englebrecht allowed Holt to remove them from Plaintiff's locker. Holt then shredded the letters. Englebrecht told Holt that her physical altercations with Plaintiff must stop.

In Spring 2006, Englebrecht called Plaintiff to her office five times to discuss the fights between Holt and a black woman with whom Plaintiff was having a relationship. Plaintiff told

Englebrecht that he did not work in the same room with either woman and knew nothing about the fights. According to Plaintiff, Englebrecht told Plaintiff that he might be disciplined or even discharged if the fighting did not stop.

In early August 2006, Plaintiff was on leave pursuant to Family and Medical Leave Act. Englebrecht hired Michiana Investigative Services to surveil him to make sure he was not violating the leave terms. The surveillance, which lasted for three days, did not uncover any wrongdoing.

**(5)** *Other Employees Subject to Alcohol and Drug Policy*

Plaintiff singles out two other employees who were subject to the Defendant's alcohol and drug policy: Todd Kucela and David Ward. Kucela, who is white, was suspected of being under influence of drugs at work. He was ordered to undergo a urine test at the plant. Kucela was unable to provide a urine sample, so he asked for Mountain Dew. Nurse Rimel gave an 8-ounce glass of water instead, after which Kucela provided the sample. He tested positive for marijuana and Defendant terminated his employment. However, Kucela was successful in negotiating a Last Chance Agreement through the Union, which allowed him to return to work in exchange for seeking drug treatment. During the grievance, Kucela admitted that he had smoked marijuana.

David Ward was terminated in 2001 for suspicion of alcohol use and refusing to take a test. Like Kucela, with the aid of the Union, he negotiated a Last Chance Agreement, promising to seek treatment for an alcohol abuse problem and to submit to random testing. Englebrecht, who terminated Plaintiff and who was Defendant's chief representative in his grievance process, was not involved in Ward's case.

8

**(C) Discussion**

In this lawsuit, Plaintiff claims that he was terminated because of his race. "To avoid summary judgment on his . . . race discrimination claims, [Plaintiff] must either point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue (the 'direct' method) or establish a prima facie case under the *McDonnell Douglas* formula (the 'indirect' method)." *Egonmwan v. Cook County Sheriff's Dept.*, 602 F.3d 845, 849–50 (7th Cir. 2010). The prima facie case requires Plaintiff to show that (1) he is a member of a protected class; (2) his job performance met Defendant's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated individual outside his protected class was treated more favorably. After such showing, if Defendant counters with legitimate, nondiscriminatory reasons for its actions, Plaintiff would also have to demonstrate that those reasons were pretextual. *Id.*

**(1) *Direct Method***

Plaintiff has not presented any evidence to create a triable issue under the direct method of proof. Although he points to his quarrels with Becky Holt as evidence of discrimination by Englebrecht, the Court is unable to discern any prohibited motive on Englebrecht's behalf. Moreover, the incidents to which Plaintiff refers were isolated and took place months before his discharge: Holt poured the soft drink inside his truck on July 20, 2005, and Englebrecht called Plaintiff into his office several times in Spring 2005 to address the fight between Holt and a black woman with whom Plaintiff was having a relationship. Likewise, the Court sees no correlation between his firing and the fact that Defendant surveiled him to ensure that he was

complying with the FMLA. In short, Plaintiff has not presented enough evidence to create a reasonable inference that Englebrecht terminated him because of his race.

Plaintiff also claims that similarly situated non-African-American employees were treated more favorably than him. However, because treatment of similarly situated employees is also a required element under the indirect method of proof, this question overlaps with the *McDonell Douglas* framework, *see Swearnigen-El*, 602 F3d at 861, to which the Court turns next. Here, too, Plaintiff fails.

**(2) *Indirect Method***

Only two prongs of Plaintiff's prima facie case are uncontested: as an African-American, Plaintiff is a member of a protected class and he has suffered an adverse employment action. The other two prongs require detailed analysis. However, insofar as the reasons for Plaintiff's termination are intertwined with his allegation of racial animus, the question of whether he was meeting Defendant's legitimate expectations merges with the question of whether Defendant's reasons for his firing are pretextual, *see Senske v. Sybase, Inc.*, 588 F.3d 501, 507 (7th Cir. 2009), which the Court will address below. At this point, therefore, the Court considers whether Plaintiff has identified a similarly situated employee who, under the same circumstances, was treated better than he was.

In disciplinary circumstances, to demonstrate that employees are similarly situated, Plaintiff must show "that two employees dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams v. Wal-Mart Stores*, 324 F.3d 935, 940 (7th

10

Cir. 2003). In addition, the same decision maker must be at the core of the disparate decision making. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618. "This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id*. at 617–18. "Without a similarly situated employee, plaintiffs cannot present a prima face case and their claims must fail." *Antonetti v. Abbottt Labs.*, 563 F.3d 587, 592 (7th Cir. 2009).

Plaintiff proposes Kucela and Ward as employees similarly situated to him. However, neither of them fits the mold. Plaintiff must present an employee who was subject to Englebrecht and was substantially similar to him in all respects, including the alleged offense—failure to produce a urine sample—but who was treated more favorably than he was. Neither Kucela nor Ward are such individuals.

Ward refused alcohol testing and was terminated as a result. Although he was later reinstated, Englebrecht was not part of either his termination or reinstatement decisions. Moreover, by pleading his innocence during the grievance proceedings—as was his right and prerogative—Plaintiff has further distinguished himself from Ward, who did not contest his fault and did not pursue arbitration, but readily admitted his offense and agreed to seek alcohol counseling.

To succeed, Plaintiff has to present an employee who, while suspected by Englebrecht of being drunk at work, failed to produce a urine sample on the first try, but was not terminated on the spot. Kucela may have been such an employee. Kucela was unable to produce a urine sample initially but was not terminated at that point. Instead, he had a chance to ask for a drink, after

which he successfully produced the sample. Only later, when the sample tested positive for marijuana, was he terminated. Arguably, because Plaintiff was not given a second chance, he was deprived of the opportunity to prove his innocence.

However, there are more differences between Kucela and Plaintiff than similarities. There is no evidence that Kucela resisted testing. Also, there is no evidence that he clocked himself out and left the building to sit in the car, or that he needed multiple requests to submit to the test, or that he went into the bathroom but only after a prolonged discussion, or that he was in the bathroom for a minute-and-a-half. Nor is there any evidence that he had insulted Englebrecht beforehand by talking about her looks and the clothes she was wearing. Hence, although Plaintiff and Kucela were both unable to produce a urine sample at first attempt, the nature and circumstances of their offenses distinguish them too much.

But regardless of whether Plaintiff can identify a similarly situated employee, he has not shown that Defendant's stated reason for his firing—that Englebrecht believed he purposefully failed to produce a urine sample—is a pretext for racial discrimination. While Englebrecht may have been unreasonable, heavy-handed, impatient, or hasty, Plaintiff has not shown that she did not honestly believe—albeit incorrectly as Plaintiff claims—that Plaintiff was being insubordinate when he came out of the bathroom with an empty cup.

On the contrary, the evidence supports her suspicions. September 5, 2006, was the first day after a labor day weekend. At the beginning of his shift, Plaintiff summoned Englebrecht to comment about her short pants and a top she was wearing over the weekend. Englebrecht found such conversation out of line and uncharacteristic of Plaintiff. She observed that his eyes were red and glazed over and she believed she smelled alcohol. Furthermore, as soon as the shift

meeting was over, Plaintiff asked his supervisor for a Y-day. Also, once the supervisor told

Plaintiff that he was suspected of being drunk and told him to go to the Occupational Health

Department, Plaintiff clocked out without permission and went to his truck. He started the engine

and sat there for a couple of minutes until a coworker told him that he needed to take the alcohol

test. Once at the Occupational Health Department, he signed the consent forms but only after a

long discussion. After all this, Plaintiff stayed inside the restroom for a minute or minute-and-a-

half but came out without a urine sample. Thus, under Plaintiff's own facts, even if Englebrecht

misunderstood Plaintiff, lost her patience, or treated him too harshly, there is nothing to suggest

that she did not sincerely believe that he was refusing to take the alcohol test. That Plaintiff may

have had something to hide is underscored by the fact that the police breathalyzer registered his

alcohol blood level at .24%. It is not the Court's job to second-guess management decisions,

unfair though they may appear; rather, the Court looks for signs of racial discrimination but can

find none here.[2] Accordingly, summary judgment in Defendant's favor is proper.


**Conclusion**

Because Plaintiff has failed to establish a prima facie case of racial discrimination and

has failed to show that Defendant's stated reason for his termination is pretextual, the Court

---

[2]Moreover, undisputed evidence shows that, even after the alleged termination, Plaintiff was given a chance to come clean by undergoing a test at an outside facility. Both Englebrecht and Union Steward Warren told him that he still needed to go to a hospital or Medpoint, yet he refused. Although the Court need not resolve this issue, Plaintiff's refusal may have been detrimental to his discrimination claim. *Cf. Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679–80 (7th Cir. 2010) (where an employer takes objective steps that are in conformity with the employee's active status within the company, such employee may not later rely on his subjective belief that he had been discharged).

grants summary judgment in favor of Defendant on all of Plaintiff's claims.

SO ORDERED on December 14, 2010.

S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE